IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

FILED
03 FEB 28 PM 4: 02
U.S. DISTRICT COURT
N.D. OF ALABAMA

CHARLIE BLOUNT, JR. and LUTHER BALL, )
)
        Plaintiffs, )
)
vs. ) Civil Action Number
) 00-C-0135-W
TUSCALOOSA COUNTY, ALABAMA, )
)
        Defendant. )

ENTERED
MAR 3 2003

## FINDINGS OF FACT

Based on the evidence adduced at the non-jury trial of this cause, the Court makes the following Findings of Fact:

I.

1. This case was commenced on January 18, 2000, by Plaintiff Charlie Blount, Jr. On March 30, 2001, Luther Ball was added as a Plaintiff. Both Blount and Ball are adult male citizens of the United States and of the State of Alabama.

2. Blount was hired by the Road and Bridge Department ("RBD") of Tuscaloosa County, Alabama, on April 10, 1995. Luther Ball was hired on October 31, 1994. Both Plaintiffs are classified as Equipment Operator II, a position which requires, *inter alia,* the possession of a commercial driver's license.

3. On May 21, 1999, Blount filed a charge of discrimination against RBD with the Equal Employment Opportunity Commission ("EEOC") complaining of racial discrimination in his

employment. In November of that year, Ball filed a similar charge.

4. RBD employs roughly 130 employees. It is headed by Bobby Hagler, the County Engineer. Aside from the unclassified laborer position (which is filled by temporary employees), there are eight other job classifications in RBD, in descending order: Assistant Engineer, Engineer Coordinator, Road Camp Superintendent, Road Foreman, Labor Foreman, Operator III, Operator II, and Operator I. The Operator classifications are hourly jobs. All the other classifications are supervisory or management positions.

5. There are twelve foremen at RBD. Currently, none of them are blacks. There are four superintendents. No black employee has ever held the position of superintendent.

6. The highest position ever held by a black RBD employee is that of Labor Foreman. One black employee has held that position; he is now retired. Presently, the highest position held by a black employee is that of Operator III.

7. It is the duty of the superintendents and foremen to make the daily assignments of operators and laborers to specific job assignments.

8. Mike Henderson, one of the two Engineering Coordinators, occasionally makes direct assignments of operators to specific jobs.

9. At the jobsite, white supervisors, particularly Mike Henderson, have occasionally used the word "nigger" when referring to the black workers. This derogatory racial reference has been used by supervisors since the EEOC charges were filed in this case.

10. Mike Henderson and other white supervisors have advised the white workers on several occasions not to fraternize with the "gang of niggers" employed by RBD, including the Plaintiffs. These admonitions have continued past the filing of the EEOC charges in this case.

11. White operators who regularly associate with black operators at RBD are subjected to less desirable job assignments in retaliation for their continued association with black operators.

12. Paving work was generally considered as some of the most onerous, least desirable work performed by RBD prior to the department's acquisition of computerized tack trucks.

13. From the time that RBD undertook the paving of county roads in 1995, until it acquired computerized tack trucks (pavers) in June, 1999, a majority (and sometimes all) of the operators assigned to paving crews were black. Black operators, including Blount and Ball, were assigned to these majority black (six to seven blacks in a paving crew of eight to nine operators) crews simply because of their race.

14. Prior to RBD's acquisition of computerized tack trucks, an operator was assigned the job of sprayer for the tar truck. The sprayer job was particularly undesirable, as the sprayer was required to ride on the steps of the tanker and manually dispense materials onto the roadbed.

15. The sprayer job was routinely assigned to Ball, while a white operator was assigned the more desirable job of riding inside the cab and driving the tar truck. More likely than not, this disparate job assignment was substantially motivated by racial considerations.

16. When the modern paving equipment was acquired by RBD, the foremen assigned mostly white operators to the paving crews.

17. In December, 1998, on one of the coldest days of the year, Mike Henderson assigned Ball to drive a cabless tractor with no heater for the entire workday. This was the least desirable job for that day. Henderson made this assignment solely because of Ball's race.

18. On the same December day, white operators with less experience and seniority were assigned to equipment with cabs and heaters.

19. When Blount applied for a job with RBD, he completed an employment application. The application contained the question: "Have you ever been convicted of a felony, or an offense involving moral turpitude?" The application contained the following: "Please note: The Civil Service Law for Tuscaloosa County prohibits hiring any person who has been convicted of a felony or an offense involving moral turpitude."

20. Blount answered "no" to the inquiry concerning conviction of a felony or an offense involving moral turpitude.

21. On June 14, 1989, Blount pled guilty to Assault in the first degree, and he was sentenced to three years in the state penitentiary. On February 28, 1990, he was placed on supervised probation for a period of five years.

22. RBD had been aware of Blount's felony conviction, and that he had misrepresented that fact on his employment application, for at least two years prior to December, 2002.

23. On November 18, 2002, this case was set for trial beginning on January 27, 2003.

24. Ricky D. Jones, a black long-term temporary laborer employed by RBD, was involved in a verbal exchange with Blount on December 4, 2002. A white operator and two black operators, including Luther Ball, were present. During the exchange, Jones repeatedly called Blount a "nigger." Blount took considerable offense to the reference.

25. A few days later, Blount went to the office of the superintendent, Larry Wilburn, to complain about Jones' use of the word "nigger" on the jobsite. Lee Welch, a black operator, and Warren Brown, a white operator, were within hearing range of the conversation between Blount and Wilburn. Welch was in the immediate vicinity of the conversation; Brown was in a more remote location behind Welch.

26. Blount related to Wilburn that Jones had repeatedly called him a nigger, and reminded Wilburn that it was Wilburn's job to handle the matter. Blount concluded: "I'm going to take it further if you don't do anything about it." Wilburn responded: "I will look into it."

27. When Blount threatened to "take it further" if Wilburn failed to admonish Jones, Wilburn was aware that Blount had filed an EEOC charge against RBD, and was aware of this pending lawsuit.

28. In an effort to retaliate against Blount for the EEOC charge and this lawsuit, Wilburn fabricated a scenario in which Blount stated to him that if Jones continued to call him a nigger, he [Blount] would "fill his [Jones'] chest up with lead." He enlisted and received the assistance of Warren Brown in verifying the fabrication.

29. Because Blount never threatened to "fill [Jones'] chest up with lead," Brown never heard the statement made, except by Wilburn. In an effort to further ingratiate himself with his supervisor, Brown testified at trial that after Blount made the threat, Wilburn looked stunned and made no verbal response before walking back into his office. The falsity of that testimony was established by Wilburn's testimony that after Blount made the threat, he [Wilburn] responded that the accusation [that Jones had used the word "nigger"] was terrible. Wilburn further testified that he [Wilburn] would make sure that thereafter Jones would not make such a statement, and that he would keep Jones away from Blount.

30. At all times when he has related the incident, Lee Welch consistently has stated that Blount never threatened to "put lead" in Jones's chest if Jones did not cease calling him a nigger.

31. After concocting his fabrication following his conversation with Blount, Wilburn contacted Jones and sought to incite him by relating that Blount had threatened to kill him. On that

5

occasion and others, Jones lied about his having repeatedly called Blount a "nigger." Until he testified at trial, Jones insisted that he had used the word "nickel" instead of "nigger."

32. Wilburn testified falsely at trial that when Jones was informed that Blount had threatened to kill him, Jones related to Wilburn that Blount had a gun in his car on the worksite and that he [Jones] had seen it. Considering that Wilburn had just informed Jones of Blount's alleged threat to fill Jones' chest with lead, Jones would have mentioned this important fact during his rambling trial testimony. Jones did not testify concerning this matter simply because he never told Wilburn of a gun in Blount's car.

33. Just last year, another black operator, Aaron J. Prewitt, complained to Wilburn about an offending co-worker and concluded by saying that unless the matter was handled, "I'll come on this job and shoot everything on it." Prewitt was never disciplined in any way for this threat.

34. Jones was never disciplined for his use of racial epithets on the job, or for lying to his supervisors about his use of them.

35. Blount was discharged by the head of RBD, Bobby Hagler, on December 15, 2002 -- roughly two weeks before the trial of this case.

36. RBD's counsel has articulated three reasons for its termination of Blount: 1) his prior felony conviction; 2) his misrepresentation of his criminal background on his employment application; and 3) his threat to "fill [Jones'] chest with lead."

37. Blount's misrepresentation on his employment application and the fact of his felony conviction, separately and severally, were not the true reasons for his discharge. As found earlier, RBD knew of these facts two years before it fired Blount, and with that knowledge, it continued Blount's employment. *Cf. Jackson v. Stinchcomb,* 635 F.2d 462 (5th Cir.1981). The Court finds

6

these two reasons to be incredible.*

> * It is a violation of Title VII to automatically disqualify a job applicant based solely on a felony conviction, without consideration of all of the nature, frequency, and circumstances of the offense, and the applicant's employment and rehabilitation history. EEOC Decision Nos. 75-103 (Dec. 16, 1974); 78-35 (June 18, 1978), 80-28 (Sept. 17, 1980); 81-7 (Nov. 12, 1980)

38. The true reason for Blount's discharge was that he had filed a charge of discrimination against RBD with the EEOC and he was pursuing it to an imminent trial in federal court.

## CONCLUSIONS

1. The Defendant assigned Plaintiffs Blount, Bell and other black employees to less desirable jobs because of their race.

2. The Defendant discharged Plaintiff Blount in retaliation for his filing and pursuit of an EEOC charge to trial in federal court.

Based on these Findings and Conclusions, the Court will order the appropriate relief.

Done this 28th day of February, 2003.

_____
Chief United States District Judge
U.W. Clemon

7